IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PATRICK D. MICHEL, DDS, *et al.*, | : | |
| | : | Case Number: 1:10-cv-638 |
| Plaintiffs, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | FINAL ORDER AND JUDGMENT |
| WM HEALTHCARE SOLUTIONS, INC., | : | ON CLASS ACTION SETTLEMENT; |
| *et al.*, | : | ORDER ON MOTION FOR |
| | : | ATTORNEY FEES |
| Defendants. | : | |

In this "junk fax" case, Plaintiffs' counsel seek final approval of a proposed class action

settlement and an award of attorney fees in the amount of 1/3 of the $4,375,000 settlement fund,

or $1,458,333.33.  For the following reasons, the Court GRANTS IN PART the Motion for Final

Approval of Class Action Settlement (Doc. 96): the proposed settlement is fair and reasonable

except as to the $10,000-per-named-Plaintiff incentive award sought.  The Court herein exercises

its discretion to reduce the amount of the incentive award to $3,000 per named Plaintiff and

APPROVES the settlement agreement as modified.  The Court also GRANTS, with

modification, Plaintiffs' Motion for Award of Attorney Fees (Doc. 98): class counsel is awarded

15% of the settlement fund, or $656,250.

## I.     Background

### A.     The Junk Fax Provision of the Telephone Consumer Protection Act

Plaintiffs claim in this case that Defendants WM Healthcare Solutions, Inc. and SK&A

Information Systems violated the Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C.

§ 227, when they sent advertisements to fax machines in medical professionals's offices.  As

recently stated by the Supreme Court of Kansas,

> The TCPA is a federal response to the ever-increasing access
> through electronic means that advertisers have to consumers.  State
> legislatures had enacted restrictions on unsolicited telemarketing
> before the federal legislation, but such measures had limited effect
> because states lacked jurisdiction over interstate calls.  It was
> estimated that some 6.57 billion telemarketing transmissions were
> being made each year by the early 1990s.  Congress intervened and
> enacted the TCPA in 1991 to address telemarketing abuses.
>
> During the debates regarding the "junk fax" provision of the
> TCPA, Congressman Edward Markey (D–MA) stated:
>
> "Every time someone junk faxes you, it is your paper that is
> coming out of the machine. You are paying for that paper. Your
> machine is tied up. It is absolutely one of the most irritating things
> to people, to have to pay for someone else coming into your home
> or your business when you do not want them there.  It is essentially
> a tax which is paid by the recipient of something that they never
> asked for in the first place." 151 Cong. Rec. H 5264 (daily ed. June
> 28, 2005).
>
> In short, the primary purpose of the TCPA is to prevent businesses
> from shifting their advertising costs to the recipients of unsolicited
> fax advertisements.

*Critchfield Phys. Therapy v. Taranto Grp., Inc.*, 263 P.3d 767, 774 (Kan. 2011) (internal

citations omitted).

To achieve its purpose of preventing junk faxes, the TCPA makes it illegal for any

person "to use any telephone facsimile machine, computer, or other device to send, to a

telephone facsimile machine, an unsolicited advertisement."  47 U.S.C. § 227(b)(1)(C).  There

are three exceptions to the prohibition: (1) the sender has an established relationship with the

recipient; (2) the number was received through voluntary communication or a directory or the

like on the Internet and the recipient agreed to make the number available; or (3) the fax contains

2

notice on the first page that is clear and conspicuous that the recipient may request their name to be removed and that failure to comply within 30 days is unlawful.  *Id*., 47 C.F.R. § 64.1200(a)(4).  The TCPA creates a private right of action to recover actual loss or $500 for each violation of the Act.  47 U.S.C. § 227(b)(3)(B).  The Court may award treble damages if the defendant willfully or knowingly violated the TCPA.  47 U.S.C. § 227(b)(3).

**B.    The Complaint**

Plaintiffs' complaint makes the following allegations:  On six occasions between February 4, 2010 and July 9, 2010, Plaintiffs Patrick D. Michel, DDS; Alan L. Laub, DDS; and Dr. Mark W. Sturdy received on facsimile machines located in their professional offices unsolicited facsimile advertisements that advertised WM Healthcare Solutions, Inc. goods or services.  Plaintiffs had no business relationship with WM Healthcare and had not given WM Healthcare permission to send advertisements to their fax machines.  WM Healthcare sent similar advertisements to the fax machines of hundreds of thousands of persons with whom WM Healthcare had no business relationship and from whom it did not obtain prior, express permission.  This conduct, according to Plaintiffs, constituted an invasion of privacy and caused them and others harm by using and consuming office equipment and supplies without permission.

Based on these allegations, Plaintiffs filed suit against WM Healthcare pursuant to the TCPA and sought certification of a plaintiff class pursuant to Federal Rule of Civil Procedure 23. After Plaintiffs learned through discovery that SK&A Information Services, Inc. transmitted WM Healthcare's advertisements, Plaintiffs amended their complaint to add SK&A as a defendant.

### C.      The Proposed Settlement Agreement and Preliminary Approval

After discovery was completed and Defendants filed pretrial motions, the parties agreed to engage in mediation, desiring to resolve the claims on a class-wide basis. These efforts proved fruitful and, nearly two-and-a half years after the complaint was filed, Plaintiffs filed a motion for preliminary approval of their proposed class action settlement.

In the motion for preliminary approval, the parties stated that they had agreed to the terms of a settlement agreement. The significant components of the proposed settlement agreement were as follows:

First, the parties agreed to the certification of a settlement class consisting of the following: (a) all persons and entities throughout the United States (b) who, on or after August 14, 2006, through August 23, 2012 (c) were sent unsolicited facsimile advertisements by or on behalf of defendant WM Healthcare Solutions, Inc., promoting its goods or services for sale. The parties estimated, based on their review of the records, that the settlement class was comprised of approximately 400,000 class members.

Second, Defendants agreed to pay the sum of $4,375,000 to a settlement fund.[1] The parties proposed to distribute the settlement fund as follows: (1) 1/3 of the fund to Plaintiffs' counsel as payment for attorney fees and expenses, including costs related to providing notice; (2) $10,000 to each of the three named Plaintiffs as an incentive award for their service; and (3) the remainder *pro rata* to settlement class members, up to $1,500.

---

[1] The $4,375,000 settlement fund is to be funded $400,000 by SK&A, individually or through its insurer, and $3,975,000 by WM Healthcare.

4

Third, the parties agreed to a method for sending notice to the estimated 400,000 potential class members. Defendant SK&A agreed to provide Plaintiffs' counsel with a list of the names and last-known fax numbers of the members of the settlement class. SK&A further agreed to send a "short form" notice of the proposed settlement agreement by fax to all persons and entities that comprised the settlement class. Thus, the cost of providing notice to class members was to be borne by Defendant SK&A, not Plaintiffs' counsel. Plaintiffs' counsel agreed to post a "long form" notice of the proposed settlement agreement on its website.

The Court held a hearing on the motion for preliminary approval of the proposed settlement agreement and notice to the class. During that hearing, the Court expressed concern about two aspects of the proposed settlement agreement: (1) the amount of attorney fees sought, and (2) the proposed incentive awards to named Plaintiffs. With regard to the latter, the Court reminded counsel that incentive awards were subject to court approval and that the named Plaintiffs would be expected to provide specific evidence demonstrating their involvement in the case in order to justify the incentive award. With regard to the request for 1/3 of the settlement fund as attorney compensation, the Court advised counsel that to support their request, they would need to provide the court with their hourly rates, a description of the services they performed, and all other information of the type that would be included in a standard billing memorandum.

The Court ordered Plaintiffs' counsel to make certain corrections and revisions to the proposed settlement agreement and notice to class members. Counsel made the changes and filed a revised proposed Class Settlement Agreement on April 11, 2013. That document, filed as Doc. 91, is the operative settlement agreement in this case.

On April 16, 2013, the Court granted the motion for preliminary approval of class action settlement and notice to the class.  In that order, the Court preliminarily certified a class, for settlement purposes only, defined as:

> (a) all persons and entities throughout the United States (b) who, on or after August 14, 2006 and through August 23, 2012, (c) were sent unsolicited facsimile advertisements by or on behalf of defendant WM Healthcare Solutions, Inc., promoting its goods or services for sale.

(hereinafter "Settlement Class" or "Class Members").  (Doc. 92.)  The Court also granted preliminary approval of the settlement agreement, appointed the named Plaintiffs as class representatives (hereinafter "Class Representatives"), and named Montgomery, Rennie, & Jonson LPA in Cincinnati, Ohio, and Edleman Combs Latturner & Goodwin LLC in Chicago, Illinois as class counsel (hereinafter "Class Counsel").  The Court scheduled a final hearing on the fairness, reasonableness, and adequacy of the proposed settlement for September 10, 2013.

**D.     Notice to the Class and Response**

Pursuant to the order granting preliminary approval, beginning on May 1, 2013, initial notice was provided to the settlement class.  SK&A sent the short form notice to 386,308 fax numbers identified by Defendants as potential Class Members, and Class Counsel posted the long form notice—a comprehensive Notice of Pendency of Class Action and Proposed Settlement—on its law firm's website.  Both the long and short form notices informed Class Members that, if they wanted to receive a cash settlement, they had to submit a claim form by July 15, 2013.  The short form notice informed Class Members that they could opt out of the lawsuit or object to the settlement by complying with the instructions and requirements for doing

6

so set forth in the long form notice. Class Members were advised in both notices that they could

appear at the September 10, 2013 fairness hearing to assert any objections.

SK&A successfully transmitted notice to 334,473 of the 386,308 fax numbers, an 86.6%

success rate. By the July 15, 2013 deadline, Class Counsel had received 9,096 timely and valid

claim forms in response to the initial notice broadcast, a response rate of less than 3%. Because

Class Counsel had predicted a response rate between 10% and 15%, counsel sought leave of

court to send additional notice to Class Members and extend the deadline for the submission of

claim forms and opt out notices. The Court granted the request and extended the response

deadline to August 15, 2013. Class Counsel then arranged for the delivery of a second round of

notice to Class Members who had not yet submitted a response. Class Counsel delivered this

second round of notice between July 22, 2013 and July 26, 2013.

**E.     Motion for Final Approval of Settlement and Attorney Fees**

On August 20, 2013, Class Counsel filed a motion for final approval of the class action

settlement. In that motion, counsel stated that they had received 13,923 valid and timely claim

forms, twenty-four late but otherwise valid claim forms, ten valid requests for exclusion from the

proposed settlement, and no objections to the proposed settlement—a total response rate of

3.6%. Class Counsel reiterated in the motion for final approval their proposed allocation of the

settlement fund as follows: 1/3 to Class Counsel; $10,000 each to the three Class Representatives

as an incentive award; and the remainder to settlement Class Members on a pro rata basis.

Assuming a total of 14,000 Class Members, the proposed settlement would result in a payment

of approximately $200 to each Class Member.

Class Counsel filed a separate motion for an award of attorney fees.  In that motion, counsel asserted that their requested award of 1/3 of the settlement fund, $1,458,333, compared favorably to recent percentage-of-fund fee awards in class actions brought in the Sixth Circuit. Counsel also argued that their requested fee was supported under the lodestar approach, which determines reasonable attorney fee awards by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  To support their $1,458,333 request, counsel proposed that the Court calculate the lodestar by applying a "blended hourly rate" of $437.50 per hour for all attorneys who worked on the case.  Multiplying their requested hourly rate of $437.50 to the 1,153 hours they reportedly worked on the case resulted in a total of $504,568.75.  Class Counsel estimated that they would incur expenses of $50,000 prosecuting the action and administering the settlement, bringing their proposed lodestar calculation to $554,568.75.  Class Counsel then stated that, to reach the $1,458,333 they sought in fees, the Court would need to apply a multiplier of 2.62 to the lodestar.  Counsel asserted that such a multiplier would be squarely within the range of multipliers accepted in the Sixth Circuit.

### F.    Fairness Hearing

The Court held a fairness hearing on the proposed settlement on September 10, 2013. During that hearing, the Court heard from Class Counsel from both the Cincinnati and Chicago law firms, as well as from defense counsel.  None of the Class Representatives were present for the hearing.  No Class Members or objectors appeared.

At that hearing, Class Counsel based in Cincinnati explained that the majority of the time spent on the case was in pursuit of discovery from Defendants.  Only one deposition was conducted in the case—that of the telephone service provider of one named Plaintiff.  Chicago

counsel did not join this case until after discovery and at the beginning of settlement negotiations.

With respect to the participation of the Class Representatives, both Cincinnati Plaintiffs, Drs. Michel and Laub, responded to written discovery.  The Chicago Plaintiff, Dr. Sturdy, joined the suit after discovery and thus did not respond to any discovery requests.  None of the Class Representatives attended the one deposition taken in the case.  Class Counsel informed the Court that Drs. Michel and Laub each received one "junk fax" and Dr. Sturdy received four "junk faxes" from WM Healthcare.

Defense counsel asserted that they have strong defenses to the claims asserted by Plaintiffs and that they would vigorously defend the action were it to proceed to trial.  Having an established business relationship with an individual or business is a defense to liability under the TCPA, and defense counsel argued that WM Healthcare had established relationships with many of the fax recipients.  Accordingly, argued defense counsel, Plaintiffs would have had difficulty obtaining class certification under Federal Rule of Civil Procedure 23 and establishing liability under the Act.

### G.     Final Claims Information

Following the fairness hearing, Class Counsel submitted a supplemental memorandum in which they provided the final outcome of the claims administration process.  The final information is as follows:  A total of 15,099 valid and timely claims were submitted, comprising 3.9% of the original list of potential Class Members provided by Defendants.  Sixty-two untimely but otherwise valid claims were submitted.  Class Counsel received eleven requests to be excluded, and no objections were filed.  Counsel requested that the court approve the late

claims, bringing the total number of claims to 15,161.  Counsel stated that after deducting from the $4,375,000 settlement fund their requested attorney fees of $1,458,333.33 and the $30,000 in requested incentive awards, the remaining fund to be distributed to these Class Members would be $2,886,666.67, or $190.40 per Class Member.

## II.     Standard for Approval of Class Action Settlement

To certify a class for settlement, a court first must consider whether the proposed class meets the requirements of Federal Civil Rule 23.  If the requirements of Rule 23 are met, then the court must ensure that the proposed class action settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  "Whether a class action settlement satisfies Rule 23(e) is committed to the sound discretion of the district court."  *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 778 (N.D. Ohio 2010) (citing *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir. 1990)).  The Court will consider counsel's briefs and the arguments made at the final fairness hearing in evaluating whether the proposed class meets the requirements of Rule 23 and whether the proposed Class Settlement Agreement (Doc. 91) is fair, reasonable, and adequate.

## III.    Analysis

### A.     Class Certification

To certify a class action, a district court must find that the class satisfies all the requirements of Federal Rule of Civil Procedure 23(a) and fits into one of the three categories in Rule 23(b).

#### 1.  Rule 23(a)

The proponent for class certification has the burden of establishing that each of the prerequisite elements of Rule 23(a) are satisfied: (1) the class is so numerous that joinder of all

10

members is impractical ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) claims/defenses of representative parties are typical of the claims common to the class ("typicality") and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").  All of these requirements are satisfied here.

First, the class is so numerous that joinder would be impractical.  WM Healthcare's advertisement was transmitted to more than 386,000 fax numbers on at least one occasion.  While the Sixth Circuit has not established a strict numerical test for the satisfaction of the numerosity requirement, it has held that "substantial" numbers usually satisfy the requirement.  *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006).  A proposed class of thousands of individuals is "substantial."  *Id*.  Accordingly, the numerosity element is satisfied.

Second, there are questions of law and fact common to the class.  Defendants in this case were responsible for the transmission of the same advertisement to the fax machines of medical professionals nationwide.  Thus, Defendants' conduct toward each class member is the same.  *See Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 444 (N.D. Ohio 2012) (certifying plaintiff class in junk fax case and noting that the following questions of law and fact were common to the class: did the defendant's conduct violate the TCPA, was the fax an advertisement, and did the defendant obtain permission to fax the advertisement?).  The fax recipients in this case are thus bound by commonalities sufficient to satisfy the second Rule 23(a) element.

Consent or the existence of an ongoing business relationship is an affirmative defense to liability under the TCPA because a fax transmission of an advertisement violates the Act only if the advertisement was "unsolicited."  *See* 47 U.S.C. § 227(a)(4) (defining "unsolicited

11

advertisement" as any advertisement "which is transmitted to any person without that person's express invitation or permission"); 71 Fed. Reg. 25967 (stating that fax senders may send fax advertisements to recipients with whom they have an established business relationship without first securing the recipient's permission).  Thus, in some TCPA cases, defendants have argued against class certification, saying that there is no commonality among persons receiving the fax advertisements because some may have given consent or have had an established business relationship with the sender.  *See*, *e.g.*, *Critchfield Phys. Therapy*, 263 P.3d 767.

Several courts have rejected this argument in opposition to class certification in TCPA cases, concluding that the established-business-relationship defense does not preclude a finding that individual questions predominate over common ones.  *See*, *e.g.*, *id*. at 777 (discussing *Display South, Inc. v. Express Computer Supply, Inc.*, 961 So. 2d 451, 457 (La. App. 1st Cir. 2007) ("the fact that some plaintiffs may offer a defense does not prohibit certification of a class") and *Lampkin v. GGH, Inc.*, 146 P.3d 847, 852, 854–55 (Okla. App. 2006) ("the issues involving permission and/or a prior business relationship do not defeat the 'commonality' of the class members' claims against Defendant.").  As those courts did, this Court finds that the receipt of unsolicited advertising faxes is common to all the potential class members.  Despite the individual issues of permission and established business relationships, the predominant factual inquiry with respect to liability will be the same for each class member: did Defendants compile recipient lists and transmit advertisements to entities on those lists without first determining that the recipients had given permission to receive such advertisements?  This common question can be proved through evidence common to the class, thus satisfying the commonality requirement of Rule 23(a).

Third, the Class Representatives' claims are typical of the claims of the Class Members. "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007). The Class Representatives' claim that Defendants sent faxes to them in violation of the TCPA arises from the same conduct that gives rise to the claims of the Class Members. Accordingly, the proposed class satisfies the Rule 23(a)(3) typicality requirement.

Finally, the Class Representatives can fairly and adequately protect the interests of the class. The Sixth Circuit uses a two-prong test to determine whether a class representative satisfies the adequacy of representation factor under Rule 23(a)(4): "'1) [T]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996). The Class Representatives and all Class Members in this case suffered the same injury—the invasion of their privacy and the consumption of their office materials. In addition, Class Representatives and Class Members are eligible for the same statutory damages: The TCPA entitles a person or entity to receive $500 for each violation of the Act and further permits the court to award treble damages if the defendant willfully or knowingly violated the Act. 47 U.S.C. § 227 (b)(3). While some Class Members may have received more than one "junk fax" from Defendants, one of the Class Representatives (Dr. Sturdy) received four junk faxes from Defendants, so his interests are aligned with, and he fairly represents, those Class Members who received more than one junk fax from Defendants. For

these reasons, the Court finds that adequacy prong of Rule 23(a) is met.[2]  To summarize, the

Court finds that each of the four Rule 23(a) requirements are satisfied for a settlement class in

this case.

### 2.  Rule 23(b)

The next component of the class certification analysis involves a determination of

whether the class fits into one of the three Rule 23(b) categories.  Plaintiffs assert that the class

satisfies the elements set forth in Rule 23(b)(3), namely, that questions of law or fact common to

the class members predominate over any questions affecting only individual members, and that a

class action is superior to other available methods for fairly and efficiently adjudicating the

controversy.

### a.  Predominance

"[T]o satisfy Rule 23(b)(3), named plaintiffs must show, and district courts must find,

that questions of law or fact common to members of the class predominate over any questions

that affect only individual members."  *In re Whirlpool Corp. Front-Loading Washer Prods.*

*Liab.*, 722 F.3d 838, 860 (6th Cir. 2013) (discussing *Amgen Inc. v. Conn. Ret. Plans & Trust*

*Funds*, 133 S. Ct. 1184 (2013) and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)).  In this

case, SK&A compiled lists of fax numbers used by medical professionals and sold WM

Healthcare a license to use those lists for advertising purposes.  SK&A transmitted WM

Healthcare's advertisements to Class Members based upon those lists.  Evidence which

---

[2]  As will be discussed later in this order, the payment of a large incentive to class
representatives may disrupt the natural alliance of interests between class representatives and
class members.  By reducing the amount of the incentive award proposed in this case, the Court
preserved the harmony of interests between the Class Representatives and the Class Members.

demonstrates the Defendants' actions with respect to creating the advertisement, compiling recipient lists, and sending the faxes will apply uniformly to all Class Members.  These common facts predominate over any individual fact questions.

### b. Superiority

In addition, the Court finds that a class action is the superior method for adjudicating this TCPA claim.  The statutory recovery available to recipients of junk faxes is $500 per violation. It is unlikely that an individual plaintiff would undertake the time and expense of a lawsuit against the sender of a junk fax for that amount of damages, particularly because the Act does not provide for recover of attorney fees.  *See Beachwood Hair Clinic, Inc.*, 279 F.R.D. at 446 (finding that a class action was the superior method of adjudicating a TCPA case because each individual plaintiff is unlikely to recover more than a small amount.)  As noted by Class Counsel during the fairness hearing in this case, WM Healthcare resisted producing discovery regarding their recipient lists and the identity of the of the fax broadcaster.  Class Counsel obtained this information only after vigorously pursing motions to compel.  The costs attendant with this type of discovery dispute would thwart an individual litigant from pursing their right to damages under the TCPA.

For the foregoing reasons, the Court finds that the Settlement Class in this case satisfies the requirements of Federal Civil Rule 23(a) and 23(b)(3).

### B.    Fairness of the Settlement

Having determined that class treatment is appropriate, the Court now must determine whether the Class Settlement Agreement proposed by the parties is fair, reasonable, and adequate.  Defendants in this case will pay the sum of $4,375,000 into a settlement fund.  From

15

that fund, Class Members will receive a cash payment, Class Representatives will receive a cash incentive award, and Class Counsel will receive attorney fees.

Courts within the Sixth Circuit refer to a list of seven factors identified in *UAW v. General Motors Corp.* to evaluate the fairness, reasonableness, and adequacy of a proposed class action settlement: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Vassalle*, 708 F.3d at 754 (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).  In addition, "although not included in the seven *UAW* factors, in evaluating the fairness of a settlement [this Circuit] ha[s] also looked to whether the settlement 'gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members.'" *Id.* at 755 (quoting *Williams v. Vukovich*, 720 F.2d 909, 925 n.11 (6th Cir. 1983)).  "[S]uch inequities in treatment make a settlement unfair." *Id*.

           **1.**      *UAW Factors*

The *UAW* factors direct the Court to conclude that settlement of this class-action litigation is in the best interests of the Class Members and that the proposed settlement is fair, reasonable, and adequate.  There is no identifiable risk of fraud or collusion: the parties engaged in arms-length negotiations and engaged the assistance of mediators to assemble a mutually agreeable settlement.  The involvement of two different plaintiffs' firms, two different defense firms, and an independent mediator greatly decrease the risk of fraud or collusion.  *See*, *e.g.*, *Hainey v. Parrott*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007) ("The participation of an

16

independent mediator in the settlement negotiations virtually assures that the negotiations were conducted at arm's length and without collusion between the parties.")

The likely expense and duration of litigation also weigh in favor of the proposed settlement.  Although the TCPA is essentially a strict liability statute that imposes liability for erroneous unsolicited faxes and the discovery produced in this case revealed that WM Healthcare's advertisements were sent to Class Members' fax machines, Defendants intend to raise the "established business relationship" defense to liability under the Act.  The process of establishing this defense with respect to each of the 386,308 fax advertisement recipients would be a cumbersome and time-consuming task.  Thus, despite the relative lack of complexity of the matter, resolving the dispute in a class-wide settlement will result in substantial savings of time for all parties, including the Class Members.

The discovery undertaken in this case was not substantial, but the Court is confident that it was adequate to identify all potential Class Members.  With respect to the likelihood of success on the merits, it appears that WM Healthcare would be found liable for violating the TCPA as to many if not all of the Class Members.  Thus, a negotiated settlement resolving the dispute with cash payments to Class Members is reasonable and fair.

Both Class Counsel and counsel for the defense stated at the fairness hearing their opinion that the proposed class settlement was in the best interests of the parties:  Class Counsel reiterated the expense that would be incurred should the matter proceed to trial; and defense counsel noted that a settlement payment of $190 to each Class Member was a significant reimbursement for the harm suffered.  No Class Members filed objections to the proposed settlement.

17

Finally, the settlement is in the best interests of the public.  Although there are three mechanisms for enforcing the TCPA's ban on junk faxes, suits brought by private citizens are, in effect, the only effective enforcement mechanism of the Act.  In addition to the private right of action afforded to individuals, the TCPA provides for forfeiture actions by the Federal Communication Commission's Enforcement Bureau[3] and civil forfeitures by state attorneys general.[4]  However, according to Class Counsel, Ohio's Attorney General has never brought an action to enforce any aspect of the Junk Fax Prevention Act, and the FCC's enforcement actions have been rare and ineffective.  The public interest is thus served by the settlement of class actions such as this one, as such action appears to be the most effective means of enforcing the twenty-year-old federal ban of junk fax advertising.

In sum, the *UAW* factors weigh in favor of a finding that the proposed settlement is fair, reasonable, and adequate.  However, the proposed settlement includes an "incentive payment" of $10,000 to each of the Class Representatives.  The inclusion of this incentive creates an inequity between Class Members and the Class Representatives.  Thus, the Court additionally must consider whether the proposed incentive payments render the settlement unfair.

---

[3] *See* U.S. Gov't Accountability Office, GAO 06-425, Weaknesses in Procedures and Performance Management Hinder Junk Fax Enforcement, at 6 (2006) ("FCC is authorized to assess and enforce a 'forfeiture' against those who violate the junk fax provisions that is, a monetary penalty against the faxer for violating the junk fax rules.")

[4] *See* 47 U.S.C. § 227(g)(1) ("Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions.")

18

## 2.    Preferential Treatment of Named Plaintiffs

The Sixth Circuit has stated that incentive awards to class representatives may be appropriate in some circumstances.  *Hadix v. Johnson*, 322 F.3d 895, 898 (6th Cir. 2003). Generally, courts that have awarded incentives to class representatives have done so to encourage members of a class to become class representatives and to reward class representatives for their "often extensive involvement with a lawsuit."  *Id*. at 897.  However, the Sixth Circuit also has found that when a settlement results in a benefit to class representatives that is disproportionate to the benefits awarded to the unnamed class members, such inequities in treatment make a settlement unfair.  *See Vassalle*, 708 F.3d at 755 (noting that at least two other circuits are in accord and citing *Holmes v. Cont. Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983) ("'[W]here representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class.'") and *Plummer v. Chem. Bank*, 91 F.R.D. 434, 442 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 654 (2d Cir. 1982) ("While there may be circumstances in which additional benefits to the named plaintiffs may be justified, such disparities must be regarded as prima facie evidence that the settlement is unfair to the class, and a heavy burden falls on those who seek approval of such a settlement." (citations omitted)).

In this case, the proposed settlement will provide each Class Member with a monetary benefit of approximately $190.  In contrast, the proposed settlement will provide each of the three Class Representatives a monetary benefit of $10,000.  Accordingly, the benefit to the named Plaintiffs is disproportionate to the benefit awarded to unnamed Class Members.  This disparity is prima facie evidence that the settlement is unfair to the class, and the burden is on

Class Counsel to demonstrate that there are circumstances in this case sufficient to justify such a disparity in treatment.

Despite having been advised by the Court during the hearing on the motion for preliminary approval that they would be required to justify the proposed incentive award to the named Plaintiffs, Class Counsel failed to do so at the final fairness hearing.  The Class Representatives' involvement in this case was not extensive.  Dr. Michel's and Dr. Laub's involvement was comprised of providing the "junk faxes" to counsel, responding to written discovery, and reviewing documents filed in the case.  Dr. Sturdy entered the case after discovery and thus had even less involvement in the case than did Drs. Michel and Laub.  None of the three Class Representatives were deposed or attended the single deposition that was taken; none attended the mediation; and none attended the final fairness hearing.  In short, the named Plaintiffs' involvement in this case was minimal and their expense in pursuing it negligible, if any.  There are no known circumstances in this case to justify the proposed settlement's disproportionate benefit to the three Class Representatives.

That said, for class actions to be effectively litigated, at least one plaintiff must be willing to take on the role of class representative.  The Court already has determined that a fair class action settlement in this case will be in the best interests of Class Members, and such a settlement would not be possible were it not for the willingness of the Class Representatives to participate in this suit.  For this reason, and to further encourage individuals to participate in

such suits, it is appropriate that the Class Representatives in this case receive some amount of an incentive award.[5]

The Court thus exercises its discretion to modify the proposed incentive award to the three Class Representatives to eliminate the disproportionate benefit the proposed settlement provides to the Class Representatives compared to unnamed Class Members. *See*, *e.g.*, *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 463 (E.D. Cal. 2013) (reducing named plaintiff's incentive award from the $7,500 requested to $2,500 in light of the disparity between the award to the named plaintiff and class members and when there was "no evidence that plaintiff spent more time assisting counsel than occurs in the average case.")

In arriving at the proper amount of an incentive in this case, the Court bears in mind the Sixth Circuit's admonition that "[t]he propriety of incentive payments is arguably at its height when the award represents a fraction of a class representative's likely damages; for in that case the class representative is left to recover the remainder of his damages by means of the same mechanisms that unnamed class members must recover theirs." *In re Dry Max Pampers*, 724 F.3d 713, 722 (6th Cir. 2013). Damages under the TCPA are actual loss or $500 for each violation of the Act, and treble damages if the defendant willfully or knowingly violated the Act. 47 U.S.C. § 227(b)(3). According to Class Counsel, Drs. Michel and Laub each received one

---

[5] The Sixth Circuit has neither approved nor disapproved the practice of incentive payments to class representatives. *In re Dry Max Pampers Litigation*, 724 F.3d 713, 722 (6th Cir. 2013). "Thus, to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design." *Id*. Further, the Sixth Circuit has "expressed a 'sensibl[e] fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.'" *Id*. (quoting *Hadix*, 322 F.3d at 897). For these reasons, the best approach to approving any amount of an incentive award is a conservative one.

junk fax from Defendant; Dr. Sturdy received four junk faxes.  Thus, the maximum recovery under the statute for the Class Representatives would be either $1,500 or $6,000.

There is precedent for incentive awards in the neighborhood of $1,000 to $5,000 in consumer protection class actions.  In separate junk fax cases, district courts in California approved a $5,000 incentive to the class representatives, justified by those individuals' service to the settlement class.  *T. Peter Tague, DC v. Healthfusion, Inc.*, No. 08-cv-2123, 2010 WL 2132746, at * 4 (S.D. Cal. May 21, 2010); *Gibson and Co. Ins. Brokers, Inc. v. Jackson Nat. Life Ins. Co.*, No. CV06-5342, 2008 WL 618893, at *3 (C.D. Cal. Feb. 27, 2008).  And in a recent class action against a vitamin manufacturer alleging violations of Ohio's Consumer Sales Practice Act and Deceptive Trade Practices Act, the district court approved an incentive award of $2,500 to the named plaintiff, who supported his request by saying that he had to miss work to attend depositions and was intimately involved in the prosecution of the lawsuit.  *Godec v. Bayer Corp.*, No. 1:10-cv-224, 2013 WL 1089549, at *4 (N.D. Ohio March 14, 2013).

In this case, the Court finds that an incentive award of $3,000 to each Class Representative is appropriate.  This amount recognizes that absent their willingness to be class representatives in this case, the Class Members likely never would have recovered damages from Defendants as their claims, individually, would not have been worth bringing.  However, the amount is not so disproportionate as to create a patent divergence of interests between the Class Representatives and the Class Members, each of whom will receive approximately $245, as will be explained below.  Further, an incentive award of $3,000 is appropriate where named plaintiffs have had minimal involvement in the litigation, as was the case here.  *See*, *e.g.*, *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 259 (D.N.J. 2005) (awarding $1,000 incentive award

22

to plaintiff who was not deposed and not required to produce documents and $3,000 incentive to plaintiff who attended a deposition, produced documents, and attended the fairness hearing.)

To summarize, having considered the memorandum in support of final approval of class settlement and all evidence submitted, and having modified the proposed $10,000-per-Class Representative incentive award downward to $3,000 per Class Representative, the Court finds that the Class Settlement Agreement is fair, reasonable, and adequate.  The Motion for Final Approval of Class Action Settlement (Doc. 96) is thus GRANTED AS MODIFIED.

### C.     Attorney Fees

The Court now turns to Class Counsel's Motion for Attorney Fees, Doc. 98.  In that motion, Class Counsel request an award of 1/3 the settlement fund: $1,458,333, inclusive of expenses.  In support of their fee request, counsel filed declarations stating the number of hours they spent on the action.  However, they did not provide records to support the statements. Further, though requesting a blended hourly rate of $437.50 per hour, Class Counsel did not advise the Court of the customary billing rates of any of the attorneys who worked on the case *nor* the prevailing market rate — that is, the rate that lawyers of comparable skill and experience could reasonably expect to command within this Court's venue.

Because the Court had advised counsel at the preliminary fairness hearing that such information was necessary for it to properly consider the fee request, the Court ordered Class Counsel to file, prior to the fairness hearing, time sheets itemizing their time spent and expenses

incurred in the prosecution of the lawsuit, as well as affidavits stating their customary billing rates.[6]  Class Counsel subsequently provided the Court with the requested information.

The billing information provided to the Court by Class Counsel at Montgomery, Rennie & Jonson prior to the fairness hearing demonstrated the following with respect to the attorneys who worked on the case:

| Attorney | Hours | Hourly Rate (for defense) |
| --- | --- | --- |
| George Jonson | 155.2 | $225–$275 |
| Matthew Stubbs | 422.8 | $185 |
| Lisa Zaring | 58.7 | $145–$185 |
| **TOTAL** | 636.7 | |

(Doc. 100 at Page ID 1112–13; Doc. 102 at Page ID 1169.)  Mr. Jonson stated he and the other members of his firm primarily perform defense litigation but, when representing plaintiffs, they routinely provide their services on the basis of a 1/3 contingency fee.  Mr. Jonson also provided billing information for attorney John Lowry, principal in the Cincinnati law firm of Boehm, Kurtz & Lowry, who performed work on the case.  Mr. Lowry's standard rate is $245 per hour, and he spent 41.4 hours on the case.  (Doc. 102 at Page ID 1173.)  The total expenses reported by the Montgomery firm were $5,934.21.

---

[6]  Class Counsel's failure to file their billing records in conjunction with their motion for fees was a significant omission.  "To establish that he is entitled to reimbursement for particular items of attorney's fees . . . the fee petitioner *must* provide the court with the attorneys' billing records that describe the work performed in sufficient detail to establish that the work is reasonably related to [the litigation]."  *Kinder v. Northwestern Bank*, No. 1:10-cv-405, 2012 WL 2886688, at *5 (W.D. Mich. June 5, 2012) (quoting *In re Pierce*, 190 F.3d 586, 593–94 (D.C. Cir. 1999)) (emphasis added).

The billing information provided by Class Counsel at Edelman, Combs, Latturner & Goodwin prior to the fairness hearing revealed that seven attorneys at that firm worked a total of 198.1 hours on the case.  These attorneys' billing rates ranged from $310 to $550 per hour.  (*See* Doc. 103 at Page ID 1238.)  The sum of these attorneys' hours worked multiplied by their standard billing rates is $81,748.  In addition to the work performed by counsel, six paralegals employed by the Edelman firm worked on the case, cumulatively logging 280.6 hours.  The hourly rate for these paralegals was $100 to $105 per hour.  Of the 538 total hours indicated on the Edelman firm's billing record, fewer than 200 were billed by attorneys.  (Doc. 103 at Page ID 1238.)  The Edelman firm's expenses were $8,445.19 as of the date of the fairness hearing. (*Id*. at Page ID 1237.)

"In common-fund cases, the award of attorney's fees need only 'be reasonable under the circumstances.'" *Van Horn v. Nationwide Prop. and Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011) (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). Ascertaining the reasonableness of a common fund settlement requires the Court to consider factors not present in statutory fee-shifting cases:  "The interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class.  In addition, there is often no one to argue for the interests of the class (that their recovery should not be unfairly reduced), since it is to be expected that class members with small individual stakes in the outcome will not file objections, and the defendant who contributed to the fund will usually have scant interest in how the fund is divided between the plaintiffs and class counsel." *Rawlings*, 9 F.3d at 516.

This case presents precisely the scenario described by the Sixth Circuit in *Rawlings*: the Class Members, who have small individual stakes, did not file any objections to the proposed settlement, and Defendants have demonstrated little interest in how the funds are divided. Accordingly, it is up to the Court to ensure that the proposed settlement is both fair to Class Members and fairly compensates Class Counsel for the amount of work done and the results achieved.

There are two methods for calculating attorney fees: the lodestar and the percentage-of-the-fund. *Van Horn*, 436 F. App'x at 498.

> The percentage of the fund method has a number of advantages: it is easy to calculate; it establishes reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery; and it encourages early settlement, which avoids protracted litigation. However, a percentage award may also provide incentives to attorneys to settle for too low a recovery because an early settlement provides them with a larger fee in terms of the time invested.
>
> The lodestar method's listing of hours spent and rates charged provides greater accountability. In addition, enhancing the lodestar with a separate multiplier can serve as a means to account for the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved. The lodestar method also encourages lawyers to assess the marginal value of continuing work on the case, since the method is tied to hours and rates, and not simply a percentage of the resulting recovery.

*Rawlings*, 9 F.3d at 516. District courts have discretion to select the more appropriate method for calculating attorney fees in light of the circumstances of the actual case before it. *Id*. at 517.[7]

---

[7] The Sixth Circuit succinctly compared these two methods for awarding fees as follows: "The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved. For these reasons, it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees

In this case, the Court will adopt the percentage-of-the-fund methodology because it is the method requested by Class Counsel, it is often used in common-fund cases, and because the Court has employed the percentage-of-fund method in determining fees in prior class-action settlements, thus permitting the Court to draw comparisons regarding the propriety of the award. The Court then will cross-check its fee determination with the lodestar method to support the reasonableness of its percentage-of-the-fund calculation.  While time-consuming, a lodestar cross-check is useful in this case because of two factors: first, Cincinnati counsel last requested an award of attorney fees fifteen years ago and thus do not have recent experience in establishing their entitlement to such an award; second, Chicago counsel have no experience requesting fees from a court in this judicial district and are not familiar with the prevailing rate of counsel in Cincinnati.

### 1. Percentage-of-the-Fund

Under the percentage-of-the-fund method for analyzing a request for attorney fees, the court determines a percentage of the settlement to award class counsel based on several case-specific factors.  *See Godec*, 2013 WL 1089549, at *2 (citing *Rawlings*, 9 F.3d at 516).  Class Counsel propose that the Court award it 1/3 of the settlement fund, citing two cases within this judicial district as support: *Johnson v. Midwest Logistic Syst., Ltd.*, No. 2:11-cv-1061, 2013 WL 2295880 (S.D. Ohio May 24, 2013) (granting motion for attorney fees and expenses in the amount of 33% of the class action settlement fund); and *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, No. 3:03-cv-467, 2009 WL 1473975 (S.D. Ohio May 27, 2009) (granting motion for

_____

in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them." *Rawlings*, 9 F.3d at 516.

award of attorney fees in the amount of 30% of the settlement fund where class counsel performed the legal services on a wholly contingent basis, expending over 2,200 hours for six years without pay while bearing the risk there would ultimately be no recovery). An award of 1/3 of a common fund is within the percentage range that courts have awarded in class action settlements in the Sixth Circuit. *In re Nat. Century Fin. Enters., Inc. Inv. Litig.*, 2009 WL 1473975, at *3. However, it remains incumbent upon the Court to evaluate the propriety of the fee award in *this case* based on the circumstances of this case, not necessarily what has been appropriate in other cases.

To determine whether the fee requested by Class Counsel is appropriate, the Court will refer to six factors identified by the Sixth Circuit in *Ramey v. Cincinnati Enquirer, Inc.*: (1) the value of the benefit rendered to the class, (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, (3) whether the services were undertaken on a contingent fee basis, (4) the value of the services on an hourly basis, (5) the complexity of the litigation, and (6) the professional skill and standing of counsel involved on both sides. *Van Horn*, 2010 WL 1751995, at *5 (citing *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 923 (N.D. Ohio 2003) (citing *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974)). There is no formula for weighing these factors; rather, the Court must consider the facts and circumstances of the case. *Godec*, 2013 WL 1089549, at *2. However, many courts consider the first *Ramey* factor to be the most important—the value of the benefit to the class. *Lonardo*, 706 F. Supp. 2d at 795.

### a. Benefit to the Class

28

A starting point for analyzing the settlement's benefit to Class Members is an assessment of their recovery as compared to their damages.  A monetary recovery consisting of over 70% of class members' estimated damages has been recognized as a "substantial and certain" benefit to the members (*In re Southeastern Milk Antitrust Litig.*, No. 2:08–MD–1000, 2013 WL 2155379, at *4 (E.D. Tenn. May 17, 2013)); a recovery of approximately 50% of an average class member's damages has been recognized as "a moderately good" result (*Van Horn*, 2010 WL 1751995, at *5).

In this case, the statutory damages available to individual plaintiffs under the TCPA is $500 per violation, or $1500 per violation if the plaintiff can demonstrate that the defendant willfully or knowingly violated the Act.  Under the settlement scheme proposed by Class Counsel, which presumes an attorney fees award of 1/3 of the settlement fund, each Class Member who submit a claim form would be entitled to $190.  This would be 38% of class members' ordinary statutory damages under the Act.  A recovery of 38% percent of damages is an ascertainable and meaningful benefit to Class Members, but given that the settlement fund is $4,375,000, there is room to provide a more substantial benefit to Class Members.

Further, when Class Counsel first proposed the settlement to the Court, their estimated benefit to Class members was only $50 to $75.  This estimate was based on Class Counsel's belief, based on previous experience in similar class actions, that 10% to 15% of the settlement class members would submit claim forms in this action.  In fact, the response rate was only 3.9%.  This fact highlights two problems: First, when crafting this settlement, Class Counsel intended a benefit to Class Members of only 10% of the members' damages, meanwhile asking the Court to award it 1/3 of the settlement fund as fees.  Second, Class Counsel achieved a

response rate that is a fraction of what is typical in similar cases.[8]  Poor response rates may indicate that the settlement is not particularly beneficial or fair to the class members.  *Cf. In re Southeastern Milk Antitrust Litig.*, 2012 WL 2236692, at *3 (where over 90% of potential class members submitted claim forms, finding that "the overwhelmingly positive class response highlights the fairness of the settlements to unnamed class members and weighs heavily in favor of approval of the settlements.")

The Court finds that the benefit-to-the-class factor does not support Class Counsel's request for 1/3 of the settlement fund in attorney fees, particularly in light of the fact that the proposed benefit to the Class Members rose to 38% of their damages only because the response rate to the class action notice forms was extremely low.

### b.  Society's Stake in Rewarding Attorneys Who Produce Benefits

The second *Ramey* factor requires the Court to consider society's stake in rewarding attorneys who produce benefits for class members in order to maintain an incentive for other attorneys to do so.  In other words, the Court must ensure that Class Counsel is fairly compensated in order to facilitate the goal of class actions: "to provide a vehicle for collective action to pursue redress for tortious conduct that is not feasible for an individual litigant to pursue."  *Lonardo*, 706 F. Supp. 2d at 795.

---

[8]  The Court recognizes that many factors affect response rates.  *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-01952, 2011 WL 6209188, at *14 (E.D. Mich. Dec. 13, 2011) (citing cases).  However, Class Counsel in this case admitted that they were surprised by the low response rate and noted that they typically achieve a response rate of 10% to 15% in TCPA class action litigation.

As discussed above, private action has proven to be the most effective means of enforcing the TCPA against those who violate the Act's junk fax provisions. For this reason, society has a significant stake in rewarding attorneys who pursue these actions.

That said, a reasonable award of attorney fees is one that is adequate to attract competent counsel, but does not produce a windfall to attorneys. *See Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 616 (6th Cir. 2007). As will be explained more thoroughly below in the discussion of the lodestar cross-check, the amount of attorney fees sought by Class Counsel, $1,458,333.33, is substantially more than what would be adequate to attract competent counsel in this judicial venue. Thus, while Class Counsel should be rewarded for enforcing the TCPA's provisions on behalf on individuals who otherwise likely would not have received any redress for the Defendants' alleged violation of the Act, neither should they be provided a windfall. Thus, this factor does not support the amount of the attorney fees Class Counsel seek.

### c.  Contingent Fee Basis and Value of Services

The third *Ramey* factor, whether class counsel undertook the litigation on a contingent fee basis, accounts for the substantial risk an attorney takes when he or she undertakes class action representation despite the fact his or her work ultimately may be uncompensated. Class Counsel took this case on a contingent-fee basis. The magnitude of the risk may be considered in terms of the time spent on the case. Here, Class Counsel worked 876 hours on this litigation; paralegals worked 260 hours. Had counsel been unsuccessful in obtaining a class settlement, those hours worked would have been for naught. However, the risk undertaken in the case did not approach that of many class action lawsuits in which class counsel were awarded fees approaching 1/3 of the settlement fund. For example, in *Lonardo v. Travelers Indem. Co*., 706 F.

31

Supp. 2d 766 (N.D. Ohio 2010), class counsel spent 7,765 hours on the case and ultimately were

awarded attorney fees equal to 26.4% of the settlement fund.  *Id*. at 803.

The value of the services rendered by Class Counsel are ascertainable by the lodestar:

that is, the number of hours reasonably expended on litigation multiplied by a reasonable hourly

rate.  *Phelan v. Bell*, 8 F.3d 369, 374 (6th Cir. 1993).  In this case, as is calculated below, the

lodestar is $338,016—less than 8% of the settlement fund of $4,375,000.  Accordingly, these

two *Ramey* factors weigh against Class Counsel's request for an award amounting to 1/3 of the

settlement fund.

### d.  Complexity of the Litigation and Skill of Counsel

The fifth and sixth *Ramey* factors deal with the complexity of the litigation and the skill

and performance of class counsel.  While the process of obtaining discovery from Defendants

was contentious, requiring Plaintiffs' counsel to file motions to compel, the litigation overall in

this junk fax case was not complex.

Regarding the quality of the work done, Class Counsel demonstrated perseverance and

skill in obtaining contested discovery from WM Healthcare, including the identity of the entity

that sold the fax number lists to WM Healthcare (SK&A) and the identities of potential class

members.  Also, the substantial dollar amount of the negotiated settlement and the fact that WM

Healthcare and SK&A both contributed to the settlement fund demonstrates that Class Counsel

negotiated zealously on behalf of Class Members.

To the contrary, the quality of the work done in presenting the proposed settlement to this

Court was ordinary at best.  For example, there were several substantive mistakes in the

proposed settlement agreement first presented to the Court.  Additionally, the originally

proposed "short form" notice that was to be faxed to class members failed to clearly instruct

potential class members how to access information for opting out of or objecting to the

settlement, and the document itself looked very much like junk fax—issues the Court required

Class Counsel to address by making changes to the notice.  Further, despite the Court's

admonition to counsel at the preliminary approval hearing that they reconsider the propriety of

their proposed incentive awards based on recent Sixth Circuit case law, they failed to do so.

To summarize, Class Counsel's request for 1/3 of the settlement fund, or $1,458,333, is

unsupported by the *Ramey* factors.  Having reviewed numerous cases involving attorney fee

awards in common fund class action settlements, the Court concludes that an award of 15% of

the settlement fund is appropriate in this case.  Case law in this judicial district supports an

award of attorney fees in the amount of 15% of the settlement fund.  *See*, *e.g.*, *Lowther v. AK*

*Steel Corp.*, No. 1:11-cv-877, 2012 WL 6676131 (S.D. Ohio Dec. 21, 2012) (granting class

counsel's request for attorney fees in class action settlement in the amount of 12% of the

settlement fund); *Connectivity Syst. Inc. v. Natl. City Bank*, No. 2:08-cv-1119, 2011 WL 292008

(S.D. Ohio Jan. 29, 2011) (granting class counsel's request for attorney fees in the amount of

15% of the settlement fund).

An award of 15% of the settlement fund, $656,250, will accomplish two important goals.

First, by reducing the amount of the fund paid to Class Counsel, the Court augments the benefit

to each Class Member.  Specifically, each Class Member now may expect to receive a cash

payment of approximately $245, or nearly half of his or her statutory damages under the TCPA.

Second, it will fairly compensate Class Counsel for the work done and the results achieved

without providing them a windfall.

33

The Court now will perform a lodestar cross-check to determine whether it supports the reasonableness of an attorney fees award in the amount of 15% of the settlement fund.

### 2.  Lodestar Cross-Check

The "lodestar" is the number of hours reasonably expended on litigation multiplied by a reasonable hourly rate.  *Phelan*, 8 F.3d at 374.  The result of this calculation "produces an award that *roughly* approximates the fee that the prevailing party would have received if he or she had been representing a paying client who was billed by the hour in a comparable case."  *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010) (emphasis in the original).  The lodestar usually is strongly presumed to yield a reasonable fee.  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).  A reasonable fee is one which is adequate to attract competent counsel, but does not produce a windfall to attorneys.  *See Gonter*, 510 F.3d at 616.

### a.  Hours Reasonably Expended

Counsel at Montgomery, Rennie & Jonson and Cincinnati attorney John Lowry began working on this case in May of 2010.  They drafted and filed the complaint, prepared discovery requests, drafted discovery responses, prepared and filed an amended complaint, prepared and filed a motion to compel, prepared and filed a second motion to compel, prepared and filed a second amended complaint, engaged in settlement negotiations, and prepared for and participated in an out-of-town mediation by May of 2012.  In August 2012, counsel at Montgomery, Rennie & Jonson were contacted by counsel at Edelman Combs in Chicago.  At that time, Cincinnati counsel agreed to add Chicago counsel to the case and to move for class certification.  Counsel filed a "Third Amended Class Action Complaint" in December 2012.  Then, in February 2013, counsel filed their motion for preliminary approval of the proposed

34

class action settlement.  The Court granted the motion for preliminary approval of class

settlement and approved the sending of notice to the class in April 2013.  Following the notice

period, in August 2013, Class Counsel filed their motion for final approval of the class action

settlement.

Between May 2010 and August 2013, counsel at Montgomery, Rennie & Jonson worked

636.7 hours on the case, and Cincinnati attorney John Lowry spent 41.4 hours on the case.

Between November 2011 and September 2013, Edelman, Combs attorneys and staff worked 538

hours on the case.[9]  Of the 538 hours reported by Edelman, Combs, 280 were worked by

paralegals.

The Court finds that the hours expended on this case were reasonable.  For Cincinnati

counsel to spend fewer than 700 hours working on a contested class action lawsuit involving

more than 386,000 potential class members and spanning three and a half years is reasonable.

Additionally, it is reasonable that paralegals would spend 280 hours reviewing class member

submissions, handling calls from class members, and assisting those members identify their

claims in a class of this size.  It is also reasonable that Edelman, Combs attorneys spent

approximately 257 hours assisting with the class action settlement negotiations and managing the

---

[9]  Edelman, Combs counsel did not enter their appearance in this case until September 26,
2012.  However, they submitted to the Court hours worked beginning in November 2011.
Edelman, Combs counsel do not explain why they are entitled to attorney fees *in this case* for
work performed nine months *before it was aware of this case*.  The Court will assume that the
hours worked by counsel building their individual plaintiff's case prior to their entry in this case
were reasonably expended in ways that advanced the settlement agreement ultimately negotiated
with Defendants.  However, it would have behooved counsel to justify these hours rather than
expect the Court to parse through counsel's submissions searching for a justification.

35

settlement class.  To determine the lodestar, the Court now must determine the applicable reasonable hourly rate.

### b.  Reasonable Hourly Rate

"When determining a reasonable hourly rate, 'courts use as a guideline the prevailing market rate . . . that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record.'" *Van Horn*, 436 F. App'x at 498–99 (quoting *Gonter*, 510 F.3d at 618).  "A district court may rely on a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests."  *Id*.

Class Counsel propose that the Court apply a "blended hourly rate" of $437.50 per hour for all hours worked to calculate the lodestar in this case.  The burden is on Class Counsel to prove the reasonableness of this hourly rate.  *Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999).

To support their request of a $437.50 per hour rate for all hours worked, Class Counsel cite a handful of district court cases within the Sixth Circuit in which courts approved hourly rates for attorneys ranging from $375 to $500 per hour.  However, only two of the cases they cite are within this venue—the Southern District of Ohio: *Johnson v. Midwest Logistic Sys.*, 2013 WL 2295880 (S.D. Ohio May 24, 2013), and *Lowther v. A.K. Steel Corp.*, 2012 WL 6676131 (S.D. Ohio December 21, 2012).  In *Johnson*, the district court did not approve an hourly rate; rather, the court observed, when using the lodestar to cross-check a percentage-of-fund award, that class counsel's average rate was $375 per hour.  *Johnson*, 2013 WL 2295880, at *6.  In *Lowther*, the court similarly employed a lodestar cross-check and concluded that $500 per hour

36

was a reasonable rate for the two senior attorneys and that rates between $100 and $450 per hour were reasonable for other attorneys and involved staff.  2012 WL 6676131, at *5.  Notably, class counsel in *Lowther* requested (and was awarded) a fee award of only 12% of the settlement fund.  *Id*. at *6.

Cincinnati Class Counsel provided a declaration listing their hours worked on the case and their expenses.  Chicago Class Counsel provided a declaration reciting their hours worked, their hourly rates charged (in Chicago, Illinois), and details pertaining to their skills and experience in handling TCPA cases.  However, neither provided the Court with any declarations pertaining to the prevailing market rate in this venue, the Southern District of Ohio.

As an aside, the Court notes that Class Counsel bear the burden of establishing the need for out-of-town counsel.  *Hadix*, 65 F.3d at 535.  Cincinnati counsel at Montgomery, Rennie & Jonson initiated this lawsuit and managed it for more than two years before the Chicago firm Edelman, Combs (along with Plaintiff Dr. Sturdy) entered the case.  Montgomery, Rennie & Jonson filed the motions to compel in the case and conducted the discovery; Edelman, Combs got involved in the case after the putative class was determined and just as settlement negotiations began to take place.

According to the declaration submitted by counsel at the Edelman, Combs, that firm routinely litigates class action claims, and "[v]ery few firms possess [Edelman, Combs'] experience and resources to administer a class of this size."  (Doc. 87 at Page ID 671.)  While it is clear Edelman, Combs has more experience with class action litigation than does Montgomery, Rennie & Jonson, Class Counsel did not dedicate any of their briefing to the specific issue of why out of town counsel's involvement was necessary to bring this proposed

settlement to fruition.  Counsel did, during the fairness hearing, discuss the fact that Edelman,

Combs has experience in administering large class settlements, experience that apparently

Montgomery, Rennie & Jonson did not have.  For this reason, the Court accepts that Chicago

counsel's participation in the lawsuit was helpful.  However, Class Counsel's request to be paid

a "blended hourly rate" of $437.50 per hour in this case, seemingly based on hourly rates

charged by Chicago counsel, is unsupportable.  While out-of-town counsel's involvement at the

sunset of this class action is beneficial to the class, those attorneys' billing rates are not the

appropriate starting point for a lodestar analysis.

Nonetheless, the Court must examine the evidence submitted by Class Counsel in order

to determine an appropriate means of cross-checking the percentage of fund award.  The hourly

billing rates for attorneys at Edelman, Combs attorneys range from $310 to $550 per hour.

However, of the 538 hours of work reported to the Court by the firm, only 198 were billed by

attorneys.  The vast majority of the hours worked were performed by paralegals, whose billable

rates are $100 to $105 per hour.  The remainder of the hours reported, 59.3, were worked by

administrative assistants, who were charged out at $30 per hour.[10]

The lion's share of the work done by counsel in this case was performed by Mr. Stubbs

with Montgomery, Rennie & Jonson in Cincinnati.  Mr. Stubbs worked 422.8 hours on this case,

and his standard hourly billing rate for defense work is $185 per hour.[11]  There is no basis for

---

[10]  The Court is unaware of legal precedent for including hours worked by administrative assistants in an attorney fees award, and Class Counsel refer to none.

[11]  Attorneys at Montgomery, Rennie & Jonson routinely provide services to plaintiffs on the basis of a 1/3 contingency fee.  The last class action the firm was involved in was in 2010; in that case, *Charton v. MB Oil, Inc.*, No. 09-cv-110417 (Ohio C.P.), the firm requested and received 25% of the settlement as attorney fees.

accepting Class Counsel's suggestion to apply a blended rate of $437.50 per hour for all hours

worked in this case.  Simply put, the vast majority of the hours worked were worked in

Cincinnati where rates are not what they are in Chicago, and the vast majority of the work

performed in Chicago was done by paralegals whose rate is approximately $100 per hour.

  Because the information provided by Class Counsel is not helpful in determining a

reasonable hourly rate, the Court will draw upon its own knowledge and experience in handling

fee requests.  Recently, this Court granted attorney fees to plaintiffs' counsel working in the

Southern District of Ohio as follows:

| Years in Practice | Hourly Rate | Rubin Rate as of 2012 |
|---|---|---|
| More than 31 | $400 | $399.14 |
| 24 | $385 | $399.14 |
| 15 | $330 | $352.77 |
| 12 | $250 to $335 | $352.77 |
| 8 | $250 | $299.77 |
| 5 | $240 | $257.54 |
| 3 | $220 | $227.74 |
| 1 | $195 | $192.10 |

*See Hunter v. Hamilton Cnty. Bd. of Elections*, No. 1:10-cv-821, 2013 WL 5467751, at *17 (S.D.

Ohio Sept. 30, 2013).  Included in the above chart is a listing of the "Rubin Rate" applicable to

those attorneys, based on their years in practice.[12]  Judges in the Southern District of Ohio often

---

  [12]  The "Rubin Rate" is a reference to an attorney fees rubric developed by the Rubin
Committee in 1983.  The Committee arrived at the following categories and hourly rates for
1983:  Paralegals—$37.91/hour; Law Clerks—$23.96/hour; Young Associates (2 years of
experience or less)—$61.77/hour; Intermediate Associates (2 to 4 years of
experience)—$71.62/hour; Senior Associates (4 to 5 years of experience)—$82.81/hour; Young

refer to the Rubin Rate and apply a 4% annual cost-of-living allowance to measure the reasonableness of fees requested.  *Georgia-Pacific LLC v. Am. Intern. Specialty Lines Ins. Co.*, 278 F.R.D. 187, 192 (S.D. Ohio 2010) (citing *West v. AK Steel Corp. Ret. Acc. Pension Plan*, 657 F. Supp. 2d 914, 932 (S.D. Ohio 2009)).

The Court has determined from the declarations provided by counsel (and the local bar association directory, where counsel did not indicate the date of their admission) the following information regarding Class Counsel:

| Attorney | Year Admitted | Years in Practice | Reasonable Hourly Rate | Hours Worked | Total Fee |
|---|---|---|---|---|---|
| James Latturner | 1962 | 51 | $400 | 2.2 | $880 |
| Dan Edelman | 1976 | 37 | $400 | 10.4 | $4,160 |
| Cathleen Combs | 1976 | 37 | $400 | 13.0 | $5,200 |
| George Jonson | 1983 | 30 | $390 | 155.2 | $60,528 |
| John Lowry | 1986 | 27 | $390 | 41.4 | $16,146 |
| Tara Goodwin | 1991 | 22 | $385 | 1.2 | $462 |
| Matthew Stubbs | 1996 | 17 | $350 | 422.8 | $147,980 |
| Michelle Teggelaar | 1997 | 16 | $350 | 3.4 | $1,190 |
| Julie Clark | 2000 | 13 | $350 | 167.3 | $58,555 |
| Heather Kolbus | 2002 | 9 | $300 | 0.6 | $180 |
| Lisa Zaring | 2006 | 7 | $250 | 58.7 | $14,675 |
| Paralegals | n/a | n/a | $100 | 280.6 | $28,060 |

Partners (6 to 10 years of experience)—$96.39/hour; Intermediate Partners (11 to 20 years of experience)—$113.43/hour; and Senior Partners (21 or more years of experience)—$128.34/hour.  *West v. AK Steel Corp. Ret. Acc. Pension Plan*, 657 F. Supp. 2d 914, 932 n.4 (S.D. Ohio 2009).

| TOTAL | | | | 1156.8 | **$338,016** |
|---|---|---|---|---|---|

*See* Doc. 102 at Page ID 1169, 1172; Doc. 103 at Page ID 1238.  While the relevant inquiry must focus on the prevailing market rate within this judicial district, the Court observes that these rates are in line with those awarded to class counsel in a recent class action lawsuit conducted in the Northern District of Ohio.  *See Van Horn*, 2010 WL 1751995, at *4 (rejecting the requested hourly rates as high as $690 per hour and concluding, based on the court's own knowledge and experience in handling fee requests, that a reasonable hourly rate was $250 for an associate, $300 for a senior associate, $350 for a junior partner, and $400 for a senior partner.)  As the above chart demonstrates, the hours worked by counsel and staff multiplied by reasonable hourly rates results in a lodestar amount of $338,016.

Class Counsel also request reimbursement of their expenses and argue that the Court should apply a multiplier to the lodestar calculation.  The Court will address both matters below.

### c.  Expenses

Class Counsel estimated that their expenses in prosecuting and administering this matter would total $50,000.  As of the date of the final fairness hearing, Montgomery, Rennie & Jonson's expenses were $5,850.27.[13]  Edelman, Combs' expenses were $8,445.10.[14]  Thus, the total expenses were $14,295.37.

---

[13]  Montgomery, Rennie & Jonson did not include its total expenses in its final submission to the Court regarding the motion for attorney fees, Doc. 102.  However, the motion for attorneys fees filed a few weeks earlier listed that firm's expenses as $5,850.27.  *See* Doc. 98 at Page ID 1034, n.23.

[14]  *See* Doc. 103 at Page ID 1237.

41

The expenses that will be incurred by Class Counsel going forward are those associated with mailing the settlement award checks to Class Members.  According to Class Counsel, they received a total of 15,161 valid claims from Class Members.  Class Counsel advised the Court at the fairness hearing that the firm will retain a third party to deliver those checks at an estimated cost of $1.50 per check.  Thus, Class Counsel will incur approximately $22,741.50 in additional expenses to administer the settlement.  Accordingly, Class Counsel's total expenses at the conclusion of this matter will be the sum of the expenses incurred ($14,295.37) plus the expense of mailing the settlement checks ($22,741.50), or $37,036.87.  Relying on these facts, the Court will deem $40,000 as the amount of Class Counsel's total expenses in this case.

### d. Multiplier

A multiplier is, "[b]y its very nature, . . . a 'bonus' to the attorneys, compensating them beyond what they would otherwise have earned from a paying client."  *Van Horn*, 2010 WL 1751995, at *5. Whether to enhance a lodestar calculation with a multiplier is within the sound discretion of the district court.  *Wells v. U.S. Steel*, 76 F.3d 731, 737 (6th Cir. 1996).  However, the Supreme Court has cautioned that courts should hesitate to employ a multiplier, especially when the factors supporting a multiplier already have been considered in the underlying lodestar calculation.  *Purdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).  Although *Perdue* was decided in the context of statutory fee shifting under 42 U.S.C. § 1988 and did not address the propriety of multipliers in class actions, the case nonetheless cautions that enhancements are atypical and should not be used when the circumstances do not warrant it.

The Sixth Circuit recently affirmed a district court's decision to apply a multiplier of 1.2, rather than the 1.78 requested by class counsel, in a class action against insurers for allegedly

failing to provide the rental car benefits required under their policies.  *Van Horn v. Nationwide Prop. and Cas. Ins. Co.*, 436 F. App'x 496, 499 (6th Cir. 2011).  The Sixth Circuit found that the district court properly exercised its discretion to apply a reduced multiplier because class members had not received an especially good benefit, class counsel had agreed to a settlement mechanism that yielded a low claims rate, and the case was not based on a novel legal theory.  *Id*. at 500.  As noted by the district court in that case, "not every result merits double recovery for class counsel."  *Van Horn*, 2010 WL 1751995, at *6.

As another example, in product liability multidistrict litigation conducted in the Northern District of Ohio, the district court applied different multipliers to each attorney's lodestar figure, taking into account the importance of the attorney's common benefit work.  *In re Oral Sodium Phosphate Solution-Based Prod. Liab. Action*, No. MDL 2066, 2010 WL 5058454 (N.D. Ohio Dec. 6, 2010).  The court acknowledged in that case that "the risk taken by the attorneys who performed common benefit work was high, the quality of those attorneys' work was excellent, and the public benefit achieved was substantial."  *Id*. at * 4.  In that case, the court awarded multipliers ranging from 1.0 to 2.0, with the average multiplier being 1.48.  *Id*. at *5.

The Court has determined that 15% of the settlement fund, or $656,250, is a fair attorney fees award in this case.  As stated, the lodestar for the work done is $338,016.  To reach 15% of the fund, the Court would need to apply a multiplier of 1.8.[15]  This is a generous multiplier under the circumstances.  However, it is within the range of multipliers recently awarded by district courts within the Sixth Circuit and suffices as a cross-check to confirm the fairness of the

_____

[15]  The Court calculated the necessary multiplier as follows: the lodestar of $338,016 multiplied by 1.8 equals $608,429.  That sum, plus $40,000 in expenses, equals $648,429.  This approximates the 15%-of-the-fund award of $656,250.

percentage-of-fund award made in this case.  This cross-check of the percentage-of-the-fund award also demonstrates the unreasonableness of Class Counsel's request for attorney fees in the amount of $1,458,333.  To reach that amount in fees, the Court would have to apply a multiplier of 4.3.  The application of such a multiplier would be entirely without support given the facts of this case.

To summarize, the settlement fund shall be distributed as follows:

| | |
|---|---|
| Settlement fund | $4,375,000 |
| Attorney fees | – $656,250 |
| Incentive Awards | – $9,000 |
| TOTAL remaining for distribution | $3,709,750 |
| Divided by 15,161 class members | $244.69 |

## IV.    CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED THAT:**

1.      This Court has jurisdiction over Plaintiffs, Defendants, members of the Settlement Class, and the claims asserted in this action.

2.      The Class Settlement Agreement, in the form filed with the Court as Doc. 91, was entered into in good faith following arm's length negotiations and is non-collusive.

3.      The Court approves of the Agreement, including but not limited to the releases in the Agreement, and finds that it is fair, reasonable, and in the best interest of the Settlement Class *except* with respect to the proposed $10,000 per named Plaintiff incentive award.  The Court hereby reduces the incentive award to be paid to each named Plaintiff to $3,000.  All members of the Settlement Class who have not opted out are bound by this Order.

44

**Class Certification**

4.     The previously conditionally certified class (the "Settlement Class") is now

finally certified pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3):

>           (a) all persons and entities throughout the United States (b) who,
> on or after August 14, 2006 and through August 23, 2012, (c) were
> sent unsolicited facsimile advertisements by or on behalf of
> defendant WM Healthcare Solutions, Inc., promoting its goods or
> services for sale.

5.     The Court finds that certification solely for purposes of settlement is appropriate

in that (a) the class is so numerous that joinder of all members is impracticable; (b) there are

questions of law and fact common to the class that predominate over any questions affecting

only individual Class Members; (c) Plaintiffs' claims are typical of the claims of the class; (d)

Plaintiffs will fairly and adequately protect the interests of the class; (e) Montgomery, Rennie, &

Jonson, LPA and Edelman, Combs, Latturner & Goodwin, LLC are adequate class counsel; and

(f) a class action is the superior method for the fair and efficient adjudication of this controversy.

6.     Plaintiffs Patrick D. Michel, DDS; Patrick D. Michel, DDS, Inc.; Alan L. Laub;

DDS; Alan L. Laub, DDS, Inc., and Dr. Mark W. Sturdy d/b/a Rochester Veterinary Clinic are

designated as representatives of the Settlement Class.

7.     The law firms of Montgomery, Rennie, & Jonson, LPA and Edelman, Combs,

Latturner and Goodwin, LLC and their respective attorneys appearing in this case are appointed

as Settlement Class Counsel.

8.     The certification of the Settlement Class is non-precedential and without

prejudice to Defendants' rights if the Agreement and this Order do not become effective as

provided in the Agreement.

**Class Notice**

9.      The Class Notice (as described in the Agreement) fully complied with the requirements of Federal Rule of Civil Procedure 23(c)(2)(B) and due process, constituted the best notice practicable under the circumstances, and was due and sufficient notice to all persons entitled to notice of the settlement of this action.  The Court approved the forms of notice to the Settlement Class.

10.      With respect to the Settlement Class, this Court finds that certification is appropriate under Federal Rule of Civil Procedure 23(a) and (b)(3).  Notice was given to each Settlement Class Member by facsimile to the facsimile number provided by Defendants.  Failed numbers were tried a minimum of two times.

Settlement Class Counsel also posted the Notice of Pendency of Class Action and Proposed Settlement on their firm's website, www.edcombs.com. These forms of Class Notice fully complied with the requirements of Rule 23(c)(2)(B) and due process, constituted the best notice practicable under the circumstances, and were due and sufficient notice to all persons entitled to notice of the settlement of this action.  A total of 15,099 valid and timely claim forms were submitted.  Sixty-two late, but otherwise valid, claim forms were submitted, and the Court grants Class Counsel's request to permit these claimants to particiate and recover as Class Members.  Accordingly, there are a total of 15,161 claims.

**Objections and Opt-Outs**

11.      No objections were filed by Class Members.

12.      A total of 11 persons/entities have validly requested exclusion from the Settlement Class.  The persons/entities that have validly opted out of the settlement are:

1. American Lung Care
2. Hospital Pharmacy, Inc
3. Tamer Michiel, DDS
4. Donald C. Mill, DVM
5. Kolesav & Associates
6. Jackson County Health Department
7. Marguerite Barnett, MD
8. SMS DO PA d/b/a Gulf Coast Medical Center
9. Gulf Coast Medical Center, Physical Therapy
10. Florida Institute for Advanced Diagnostic Imaging
11. Richard Buss, MD

**Delivery of Settlement Fund**

13. Defendants shall pay and deliver the total sum of $4,375,000.00 (the "Settlement Fund") as specified in paragraphs 10 and 12 of the Agreement. Settlement Class Counsel thereafter shall present an Order to the Court as specified in paragraph 12 of the Agreement. Settlement Class Counsel shall hold the Settlement Fund in the firm's escrow account until the Effective Date of the Settlement Agreement (defined in paragraph 7 of the Agreement) and then distribute the Settlement Fund as set forth in paragraph 14 below.

**Distribution of Settlement Fund**

14. The Settlement Fund shall *not* be distributed as set forth in paragraph 11 of the Agreement but rather shall be distributed as follows:

a. $3,000.00 of the Settlement Fund shall be paid to each of the three named Plaintiffs as an incentive award in recognition of their services as Class Representatives;

b. Each Settlement Class Member who submitted a valid and completed claim form by September 12, 2013, will receive a check representing a pro rata share of the Settlement Fund after the amounts set forth in subparagraph 14(a) above and subparagraph 14(c) below are paid; and

47

c.     Class Counsel shall be awarded 15% of the Settlement Fund of $4,375,000.00 (or $656,250.00) as payment for attorney fees and expenses including costs related to administration of the settlement.

## Releases

15.     Upon the payments described in paragraph 14 above, Plaintiffs and each Settlement Class Member shall be deemed to have granted the releases set forth in paragraph 18 of the Agreement.

## Award of Attorneys' Fees, Costs, and Incentive Award

16.     The Court has considered Class Counsel's application for attorneys' fees and expenses, which shall include costs incurred in connection with administration of the Settlement. The Court awards $656,250.00 and finds this amount of fees and expenses is fair and reasonable. These amounts have been sufficiently supported and shall be paid from the Settlement Fund as specified in paragraph 14 above.

17.     The Court grants Class Counsel's request for an incentive award to each of the three Class Representatives and, accordingly, awards $3,000.00 to Patrick D. Michel, DDS; Alan L. Laub; DDS; and Dr. Mark W. Sturdy.  The Court finds that this payment is justified by the Class Representatives' service to the Settlement Class.  This payment shall be made from the Settlement Fund as specified in paragraph 14 above.

**Other Provisions**

18.     The Parties to the Agreement shall carry out their respective obligations

thereunder.

19.     Neither the Agreement, this Order, nor any of their provisions, nor any of the

documents (including but not limited to drafts of the Agreement, the Preliminary Approval Order

or this Order), negotiations, or proceedings relating in any way to the settlement, shall be

construed as or deemed to be evidence of an admission or concession of any kind by any person,

including Defendants, and shall not be offered or received in evidence in this or any other action

or proceeding except in an action brought to enforce the terms of the Agreement or except as

may be required by law or court order.

20.     Any amounts remaining in the Settlement Fund following the last void date of the

checks issued to the Settlement Class Members, including any uncashed checks or undistributed

funds, shall be designated as a *cy pres*, or "next best use" award.  The parties designate and the

Court approves the Legal Aid Society of Southwest Ohio, LLC as the *cy pres* recipient.

Settlement Class Counsel or their Administrator shall distribute a check payable to the *cy pres*

recipient.

21.     Settlement Class Counsel or their Administrator shall file an affidavit of final

accounting of the settlement by June 16, 2014.

The Court **GRANTS IN PART** the Motion for Final Approval of Class Action

Settlement (Doc. 96): the proposed settlement is fair and reasonable except as to the $10,000-

per-named-Plaintiff incentive award sought.  The Court APPROVES the Settlement Agreement

as modified herein.

49

The Court also **GRANTS, WITH MODIFICATION**, Plaintiffs' Motion for Award of

Attorney Fees (Doc. 98): class counsel is awarded 15% of the settlement fund, or $656,250.

Pursuant to the above final approval of class action settlement, this action is hereby

DISMISSED.


IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court